# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

| | |
|---|---|
| **HARMONIA HOLDINGS GROUP, LLC** | |
| *Plaintiff,* | Case No. __24-981 C__ |
| | Judge _____ |
| v. | |
| **UNITED STATES,** | ███████████████████ |
| *Defendant.* | |

## COMPLAINT

For its bid protest against the United States of America, Plaintiff Harmonia Holdings Group, LLC ("Harmonia") shows the Court as follows:

## Nature of the Action

1.      The United States Department of Health and Human Services ("HHS") Health Resources and Services Administration ("HRSA") ("Agency") notified Harmonia that it made an award to General Dynamics Information Technology ("GDIT" or "General Dynamics") under the Agency's National Practitioner Data Bank ("NPDB") Blanket Purchase Agreement ("BPA") Request for Quote 75R60224Q00052 ("Solicitation" or "RFQ").  Harmonia protests the Agency's decision to award the BPA to General Dynamics and not to Harmonia.

## The Parties

2.      Harmonia is a limited liability company headquartered in McLean, VA.

3.      The United States of America, for all purposes relevant hereto, acted by and through the Agency.

**Jurisdiction and Standing**

4.      The Court has subject-matter jurisdiction over this bid protest under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996.  28 U.S.C. § 1491(b)(1).

5.      Harmonia is an "interested party" because it is an actual bidder and, absent the errors alleged in this complaint, had a substantial chance of receiving award.

6.      But for the Agency's errors discussed below, Harmonia would have received fewer weaknesses.  With its price advantage and the Agency's failure to consider GDIT's adverse past performance, Harmonia would have had a substantial chance of receiving award.  It therefore has standing to pursue this matter.

**Factual Background**

7.      The Agency issued the Solicitation pursuant to under FAR Part 8.405-3 to establish a single vendor BPA for the Agency to procure "Operations and Maintenance (O&M) and Development, Modernization and Enhancement (DME) Services for HRSA's Bureau of Health Workforce (BHW) National Practitioner Data Bank (NPDB)."

8.      The Solicitation said that the BPA was issued against the GSA Multiple Award Schedule and has a period of performance consisting of one 12-month base period and four 12-month option periods.  The Statement of Work ("SOW") said that orders under the BPA would be firm-fixed price, time-and-materials, labor hour or a hybrid combination, depending on the specific work at the order level.

9.      Broadly, the SOW said the scope of work was to provide "IT support services for the NPDB system and program to help BHW accomplish its mission of improving the health of underserved and vulnerable populations by strengthening the health workforce and connecting skilled professionals to communities in need."

10.     The SOW further stated that "[t]he services to be provided under this BPA shall cover all the IT functions such as business and data analysis, Tableau dashboards, all phases of the Software Development Lifecycle (SDLC) for the DME projects, O&M, integration of NPDB with external systems, documentation, software procurement as part of ODCs. In addition, it will cover System administration, Database administration, Infrastructure support, Cloud hosting, Enterprise architecture, and Data Governance."

11.     For the BPA tasks, the SOW divided the requirements into ten task areas:

| Task Area | Description |
| --- | --- |
| Task Area 1 | Program and Project Management |
| Task Area 2 | Support for Program Operations |
| Task Area 3 | DME Services |
| Task Area 4 | O&M Services |
| Task Area 5 | Forms and Correspondence Systems for Users |
| Task Area 6 | 21st Century IDEA Act |
| Task Area 7 | Security Services |
| Task Area 8 | Transition |
| Task Area 9 | Other Contract Requirements |
| Task Area 10 | Baseline Security Requirements |

12.     As an illustration of how the requirements were broken down, for example, under Task Area 1, the SOW said the selected contractor was to provide Program Management Services (1.1), which included:

- 1.2.1 Prepare, maintain and follow a written Program Management Plan outlining the contract management approach, management controls, and organizational resources for all of the calls.

- 1.2.2 Each call shall have its own Program Management Plan that provides the point of contact, team roster, project purpose, place and period of performance, projects details, management approach, management controls, other organizational resources, deliverables, and deliverable dates.

- 1.2.3 The Program Management Plan shall be submitted to the COR in accordance with the delivery schedule specified in the call.

- 1.2.4 Provide separate monthly status and invoice reports for calls that include information on progress, cost, schedule, quality assurance, configuration management, and security services.

- 1.2.5 Provide weekly updates to the COR and specified HRSA staff of the status of each call.

13.     Task Area 1 also included Administrative Requirements (1.1), Project Management Services (1.3), Reporting Requirements (1.4), Capital Planning and Investment Control and Earned Value Management (1.5), Enterprise Performance Life Cycle (1.6), and Risk Management (1.7).  Like the Program Management Services (1.1) example above, each sub-task requirement included numbered examples of tasks.

14.     Notably, the full scope of typical tasks/requirements that are "required of the [selected] contractor in the performance of awarded orders" under SOW Section 2.5 – Task Areas spanned nearly 50 pages.

15.     The SOW also stated that BPA "[o]rders shall specify the actual tasks to be performed along with the project-specific information required for completion of the order."

**Instructions and Evaluation Criteria**

16.     The Solicitation said that bidders were to provide their quotations in four volumes: Technical, Price, Past Performance, and Voluntary Product Assessment Template ("VPAT").  In turn, the Solicitation included four evaluation factors the Agency would use to determine best value: Factor 1 – Technical; Factor 2 – Price; Factor 3 – Past Performance; and Factor 4 – Section 508.

17.     For **Factor 1 – Technical**, the Solicitation stated that the evaluation of technical quotes would be based on the following eight subfactors: (1) Understanding the Program Need; (2) Technical Requirements; (3) Understanding of the PCI-DSS Level Two Certification Process; (4) Management Approach and Staffing; (5) Organizational Capacity and Multi-Vendor Collaboration Experience and Approach; (6) Challenge Scenario 1; (7) Challenge Scenario 2; and (8) Hypothetical O&M Call Order.

18.     Under subfactor **Understanding the Program Need**, the Solicitation said that offerors "shall demonstrate their knowledge and understanding of the mission and vision of HRSA and the Bureau of Health Workforce (BHW)" and that offerors should "discuss their understanding of the program's needs that are addressed by BHW regarding the National Practitioner Data Bank system and the components that make up the system."

19.     Under subfactor **Technical Requirements**, the Solicitation said that "shall describe, in detail, their technical approach to meet the requirements of each task area and subtask as described in the Statement of Work."  The Solicitation also said that offerors shall "shall demonstrate experience managing large, complex IT systems using Agile best practices for multiple projects that occur concurrently and have interrelated dependencies" and shall

demonstrate experience with Cloud hosting, Cloud architecting, and taking advantage of Cloud optimization tools. Offerors were required to, among other things, "describe their software development approach to enhance the NPDB system and a recommended future state vision. The offeror shall outline specific changes they would propose to the existing architecture, technologies used, process management, or any other changes to move towards the proposed future state wherever applicable."

20.     Under subfactor **Understanding of the PCI-DSS Level Two (2) Certification Process**, the Solicitation said that offerors were to "explain, in detail, how they will provide documentation and support HRSA in maintaining the HRSA-owned PCI-DSS Level Two (2) merchant certification to save credit card information and process payments through WorldPay."

21.     Under subfactor **Management Approach and Staffing**, offerors were required to "propose a management approach that defines how the contract, program, and project will be executed, monitored, and controlled. This approach shall include their plan for human resources and staffing with regard to managing scope, schedule, and quality assurance." Further, offerors were required to "explain how their management and staffing plan will enable the Offeror to start projects quickly, work efficiently by conducting multiple tasks concurrently, complete complex tasks within narrow timeframes, and assure the quality of the products and services provided." Offerors' management approaches were required to include a host of other things like methods for employee recruitment and retention, identifying proposed subcontractors, identifying facilities and equipment, and include resumes for six Key Personnel positions.

22.     The six Key Personnel positions were: (1) BPA Program Manager; (2) Project

Manager; (3) Security Architect, Expert; (4) Senior Cloud Solution Architect; (5) Business

Analytics Manager; and (6) Data Scientist.

23.     Under subfactor **Organizational Capacity and Multi-Vendor Collaboration**,

the Solicitation said that offerors were to "describe and demonstrate their experience in

successfully managing contracts as a prime contractor involving large IT applications hosted in

the Cloud, development, modernization, enhancements, and best practices."  Among other

things, offerors were required to "provide a description of a minimum of one (1) or more large

enterprise software application projects within the past five (5) years, or one that they are

currently performing, that demonstrates the Offeror's experience with similar scope, size, and

complexity as the NPDB BPA requirement."  Offerors were also required to describe and

demonstrate experience in "successfully collaborating in a multi-vendor environment to support

a program using a large custom IT system."

24.     Under subfactor **Challenge Scenario 1: Unified Case Management**, offerors

were required to describe a practical approach to a scenario involving case management

software.  As part of their response, offerors were required to address the following questions:

(1) What development models or frameworks do you have experience with that are most

successful in addressing issues similar to the challenge presented above?; (2) What solution

would you propose to resolve the government's case management need?; (3) How would you

address scope that is not clearly defined?; (4) How would you ensure requirements are not

missed because a particular topic never came up in requirements gathering?; (5) How would you

ensure quality and deliver fully functional software on time?  Further offerors were to support

their approach with examples and include how they overcame pitfalls in the process, among other things.

25. The Solicitation also said that "[t]he response shall include the following sections: 1) Requirements; 2) Assumptions; 3) Proposed Technical design; 4) Proposed number and type of staff; and 5) Proposed timeframe to implement. The approximate firm-fixed-price cost shall be included in the Offeror's price quote."

26. Under subfactor **Challenge Scenario 2: NPDB Data Strategy**, the Solicitation said that the Agency envisioned a robust, uniform data strategy, governance plan, and management in the future. In responding to this challenge scenario, the Solicitation said that offerors were to address the following questions: (1) How would you create a data quality framework for a large data set such as NPDB?; (2) How would you create a comprehensive ontology for the NPDB data elements?; (3) How would you propose consolidating many data sources, including legacy systems, cloud services, and external databases, to create a unified data environment?; (4) What artificial intelligence (AI) and machine learning (ML) solutions would you propose to enhance NPDB data processes?; and (5) How would you propose to handle ongoing data management across the NPDB program?

27. Like the first challenge, the Solicitation also said "[t]he response shall include the following sections: 1) Requirements; 2) Assumptions; 3) Proposed Technical design; 4) Proposed number and type of staff; and 5) Proposed timeframe to implement. The approximate firm-fixed-price cost shall be included in the Offeror's price quote."

28. Finally, under subfactor **Hypothetical O&M Call Order**, the Solicitation said "[f]or the purposes of the technical proposal evaluation, the Offeror is not expected to develop a

fully conceived proposal; rather, the intent is to show how the Offeror would approach and respond to the hypothetical call order requirements and demonstrate the related present or past (within the last 5 years) experience of the Offeror delivering proposals of similar size, scope, and complexity projects. The Offeror shall note when their approach results in artifacts or deliverables." The Solicitation further stated that "[t]he response shall include the following sections: 1) Requirements; 2) Assumptions; 3) Proposed technical approach; 4) Proposed number and type of staff" and that "[o]fferors shall support their approach using specific examples where they operated and maintained a similar solution in the past five (5) years."

29. In evaluating quotes, the Q&A2 (No. 17) the Agency clarified that while the technical Factor 1 has several subfactors, "[t]he subfactors will not be rated directly. They will be taken into consideration for the overall rating of each Factor. The sub factors are listed in the order of descending importance."

30. In evaluating Factor 1, the Solicitation said that the Agency would use the following adjectival rating scheme:

| Adjectival Ratings | |
|---|---|
| **Rating** | **Description** |
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths, which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Satisfactory | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have |

| | little or no impact on contract performance. Risk of unsuccessful performance is no worse that moderate. |
|---|---|
| Marginal | Proposal does not clearly meet requirements and has demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses, which are not offset by strengths. Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is not awardable. |

31.    In addition to the adjectival rating scheme, the Solicitation included the following definitions:

| Definition | Description |
|---|---|
| Strength | An aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. |
| Weakness | A flaw in the proposal that increases the risk of unsuccessful contract performance. |
| Significant Weakness | A flaw that appreciably increases the risk of unsuccessful contract performance. |
| Deficiency | A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. |

32.    For **Factor 2 – Price**, the Solicitation said that offerors were to identify the "GSA MAS, GSA MAS Labor Categories, the schedule price/rates, any unit prices used, any discounts proposed and any other relevant pricing information."  The Solicitation also said that offeros were to complete specific Blocks in SF 1449.  For Hypothetical Call Order Pricing, the Solicitation said that offerors were to "[p]rovide firm-fixed-pricing for the Hypothetical Call Order, to include the proposed labor categories and hourly rates. This pricing will be analyzed to

ensure the labor categories and hours align with what is proposed in the technical quote and to determine price reasonableness and fairness."

33. For the Challenge Scenarios pricing, the Solicitation said that offerors were to "[p]rovide firm-fixed-pricing for Challenge Scenario #1 and Challenge Scenario #2, to include the proposed labor categories and hourly rates. This pricing will be analyzed to ensure the labor categories and hours align with what is proposed in the technical quote and to determine price reasonableness and fairness."

34. Offerors also were to provide supporting documentation for the BPA and for the Challenge Scenarios and Hypothetical Call Order.

35. The Solicitation further stated that Factor 2 Price will be evaluated on the offeror's "proposed on-site and off-site labor rates for each labor category required across the life of the BPA, any applicable discounts," and proposed prices for the Hypothetical Call Order and Challenge Scenarios. The Solicitation in turn said that the Agency "reserves the right to reject any quote that includes any assumption(s) that adversely impact(s) the Government's requirements or fails to comply with any of the requirements outlined herein. In addition, proposed labor categories that are not in the offeror's GSA schedule will be determined unreasonable and automatically disqualify an offeror for the award."

36. For **Factor 3 – Past Performance**, the Solicitation said that "[o]fferor's shall submit a total of three (3) past performance references for the technical proposal where the Offeror was the prime contractor for relevant work completed within the past 3-5 years as required by this solicitation." Under the Solicitation, "relevant" was defined as projects of similar in size, scope and complexity to this procurement. The Solicitation also said that the

Agency "reserves the right to obtain information for use in the evaluation of past performance from any and all sources including sources outside the government."

37.     In evaluating Factor 3, the Solicitation said that the Agency would evaluate offerors under Past Performance Relevancy Rating Standards and Performance Confidence Assessments Standards, which would result in two ratings. The Solicitation further stated that under the relevancy rating, the Agency "will evaluate the Offeror's past performance references to determine how relevant a recent effort is to the current requirement for source selection. Common aspects of relevance include similarity of service/support, complexity, magnitude of effort, dollar value, and contract type." And, for the confidence rating, the Solicitation said that the Agency "will evaluate the Offeror' s past performance to determine the quality of work performed and assess the level of expectation that the Offeror can successfully perform the required effort."

38.     For Past Performance Relevancy, the Solicitation used the following scheme:

| Past Performance Relevancy Rating Standards | |
|---|---|
| **Rating** | **Definition** |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

39.     For Past Performance Confidence, the Solicitation used the following scheme:

| Past Performance Confidence Assessment Standards | |
| --- | --- |
| **Rating** | **Description** |
| Exceptional Confidence | Based on the Offeror's recent/relevant performance record, the Government has very high expectations that the offeror will successfully perform the required effort. |
| Very Good Confidence | Based on the Offeror's recent/relevant performance record, the Government has very good expectations that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has reasonable expectations that the offeror will successfully perform the required effort. |
| Marginal Confidence | Based on the offeror's recent/relevant performance record, the Government has minimal expectations that the Offeror will successfully perform the required effort. |
| Unsatisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the Offeror will successfully perform the required effort. |
| Unknown Confidence (Neutral) | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

40.     Under **Factor 4 – Section 508**, the Solicitation said that offerors "shall submit a Voluntary Product Accessibility Template (VPAT) for the NPDB system in accordance with HHSAR provision [352.239-73]."  In evaluating Factor 4, the Solicitation said "[t]he evaluation of the VPAT is independent from the other factors and will be based on the demonstrated capabilities of the prospective Offeror to meet the requirements of all the applicable Section 508 standards as listed in HHSAR clause 352.239-74 Electronic and Information Technology Accessibility."

41.    The Solicitation said that the Agency would evaluate Section 508 under the following scheme:

| | |
|---|---|
| ICT Products fully meet intent of <u>all</u> applicable Section 508 Standards. Risk of failure to meet all Section 508 Requirements is <u>very</u> low. | **Green** |
| ICT Products can be made capable of meeting the intent of <u>all</u> applicable Section 508 Standards by using alternative methods for some or all of the products. Risk of failure to meet all Section 508 Requirement is low. | **Yellow** |
| ICT Products fail to meet the intent of any of the applicable Section 508 Standards or the VPAT is materially incomplete. Risk of failure to meet all Section 508 Standards is high. | **Red** |

42.    For the Agency's **Best Value Determination**, the Solicitation said that the four factors above – Technical, Price, Past Performance, and Section 508 – would be evaluated on a stand-alone basis.  As indicated above, the Solicitation said that "Factor 1 will be evaluated using an adjectival rating system. Factor 2 will be evaluated on the offeror's proposed on-site and off-site labor rates for each labor category required across the life of the BPA, any applicable discounts, and proposed prices for the Hypothetical Call Order and Challenge Scenarios. Factor 3 will be evaluated in accordance with the following Past Performance Relevancy Rating Standards and Performance Confidence Assessments Standards. Factor 4 will be evaluated independently from the other factors[.]."

43.    Technical was the most important factor.  Price was the second most important factor.  Past Performance was the third most important factor.  The Solicitation said "[t]he Technical factor is more important than Price factor" and that the "Price factor is more important than Past Performance factor."

44.     The Solicitation also said that if the Agency's "technical and price evaluation reveals that two (2) or more offers are approximately equal, then the past performance will become increasingly more important."

45.     In awarding the BPA, the Solicitation said that the Agency would ultimately "select the responsible GSA schedule offeror whose quote, in conforming to this RFQ, provides the best value to the Government."

46.     Harmonia timely submitted a responsive, compliant and awardable quote.

**Evaluation and Award Decision**

47.     On June 5, 2024, the Agency notified Harmonia that it selected GDIT for award under the Solicitation, with an award amount of $7,857,210.70.

48.     On June 6, 2024, Harmonia requested a brief explanation from the Agency, and on June 12, the Agency provided its response.

49.     The Agency's brief explanation was extremely brief, providing Harmonia little concrete information regarding its own quote and almost no information regarding that of GDIT.

50.     The Agency said "[a]lthough [Harmonia's] total evaluated price for the hypothetical and challenges is $███████ lower than [GDIT], but the technical quote submitted by Harmonia received an overall rating of Satisfactory compared to GDIT's overall rating of Outstanding."

51.     The brief explanation also said "[t]he Government determined that Harmonia's three past performance references were Relevant, Relevant and Somewhat Relevant, and

received Very Good Confidence. The Government determined GDIT's three past performance references were all Very Relevant and received Exceptional Confidence."

52.     Harmonia immediately emailed the contracting officer to request more details on the Agency's evaluation. The next day, the Contracting Officer replied to Harmonia and said "details of the evaluation are not required to be disclosed."

53.     After Harmonia filed a pre-filing notice, the Agency followed up with a more robust discussion of issues. While this brief explanation gave Harmonia information about the evaluation of its quote, the Agency did not provide additional information regarding GDIT.

The Agency told Harmonia that the TEP assigned Harmonia's technical quote an overall rating of ██████. Harmonia received a rating of:



███████████████████████████████████

**Count One**
**The Agency's evaluation of quotes was arbitrary, capricious and contrary to law**

54.     Harmonia adopts the allegations in the preceding paragraphs by reference, as if fully set forth herein.

55.     Under Factor 1, the Agency made several erroneous findings, which renders its evaluation arbitrary and irrational.  Harmonia presents examples of these errors in table form for readability.

Technical subfactors

56.     Under <u>Management and Staffing Approach</u>, Harmonia received a ███████ rating. In several instances, the weaknesses the Agency assigned arose from a failure to reasonably read Harmonia's quote.  The following were improperly assigned:



17





57.     Under <u>Organizational Capacity and Multi-Vendor Collaboration Approach</u>, Harmonia received a ███████ rating.  The Agency made several errors, examples of which are described below.







58.     Under <u>Challenge Scenario 1: Unified Case Management</u>, Harmonia received a

█████████ rating.

59.     This evaluation criterion concerns a "challenge scenario" that actually occurred

during GDIT's performance.  Under the incumbent contract, GDIT's prior "low-code solution

failed," and, as stated in the RFQ, on p. 7, "the government ultimately paused the effort due to

██████████████████████████████████████████████████

higher-than-expected costs and longer than expected timelines." This challenge scenario requested that vendors provide new approaches so that the Agency could obtain those services GDIT failed to deliver.

60. Harmonia received a █████████ rating. However, in evaluating Harmonia's quote, the Agency made several errors. These include the following.







61.     Under <u>Challenge Scenario 2: NPDB Data Strategy</u>, Harmonia received a

███████████████████████ being incorrectly assessed:



62.     In addition, the Agency's discussion was cursory, allotting two sentences to a 17-page response.  The Agency appears to have missed several substantial benefits proposed by Harmonia.  These included:





CONTAINS INFORMATION SUBJECT TO REQUESTED PROTECTIVE ORDER



63.     Under <u>Hypothetical O&M Call Order</u>, Harmonia received a ███████ rating.  This aspect of the evaluation was also plagued by errors.  These include the following:



████████████████████████████████████████████████



64.     Harmonia also merited consideration for additional strengths the Agency did not assign.  While the Agency certainly has discretion in determining whether to assign strengths, it cannot do so for one party where another has substantively identical features.  Moreover, the Agency has a duty to treat offerors fairly and on a level playing field.  It cannot reasonably evaluate a vendor against one standard while treating another differently.

65.     Based on those principles, on information and belief, GDIT received credit for a variety of aspects of its technical approach that Harmonia also did.  While GDIT received credit, Harmonia did not.

[REDACTED]

68.     There is no evidence the Agency considered these.

Past Performance

69.     The Agency's evaluation of <u>Past Performance</u> was equally problematic. Harmonia did not receive sufficient credit for its relevant prior performance while the Agency appears to have ignored GDIT's troubled performance history on the incumbent contract— despite that information being close-at-hand.

70.     The Brief Explanation stated that [REDACTED] GDIT had used its incumbent performance on NPDB in their proposal, the quotation seems inconsistent with a performance issue on GDIT's work concerning Unified Case Management, as outlined below. Even if GDIT had submitted CPARS that were Exceptional leading to Exceptional Confidence, the "close at hand doctrine" prohibits the Government from ignoring bad performance data even if not disclosed in the CPAR. NPDB was aware of these failings.

71.     The RFQ contained two Challenge Scenarios, and #1 required Offerors to propose a new solution to Unified Case Management (UCM).  As discussed above, the Agency told vendors in questions and answers (and the Agency knew) that GDIT had failed to perform this aspect of the requirement.  For example:

- The Government revealed in the initial RFQ release's Q&A in question 68 that the initial plan of storing UCM information and using a low code platform (Pega) was not able to be realized, which presumably was work done under GDIT: "All current tracker information is stored in the Oracle database and the supporting documents in AWS [Amazon Web Services] S3 Bucket. With UCM, the tracker information was to be stored in the same Oracle database, while some UCM configuration data was to be stored in PEGA's [a Commercial off the Shelf (COTS) technology] own proprietary database."

- The Government further revealed in Amendment 4 (Mod 6) Q&A Q65 that the UCM work was "put on pause" pending the Government's need for "a solution with a reasonable cost," thereby further highlighting inability for GDIT to control cost on its current contract:

- The Agency also discussed the issue in Question 64, which stated:

    Draft RFQ Cover Page, pages 7-8, For "Challenge Scenario 1: Unified Case Management" Would the Government consider providing additional detail related to the decision to "Pause" the previous attempt at a COTS low code so that we will be able to specifically address the cost and time to implement concerns? That is, is it possible to summarize factors that drove the cost and timeline for implementation higher than expected?

Answer: HRSA has to prioritize projects due to limited DME [Development, Modernization and Enhancement] dollars. The case management tool is only used by about 20 people internally, so HRSA was not able to justify spending millions of dollars on a tool for such a small audience when the funds could be redirected to impact hundreds of thousands of users for the NPDB. Although we have made some progress, case management is still an area that needs improvement. Development of the case management tool is paused for now, but we still need a solution with a reasonable cost. We are open to new and innovative solutions but need a use case and ROE to push anything forward.

- The pause was also described in the RFQ on page 7: "Following a review of several products, a leading COTS case management workflow tool was selected. The government ultimately paused the effort due to higher-than-expected costs and longer than expected timelines."

- The Government further stated in the RFQ page 7 under Challenge Scenario 1, "long had a need to upgrade its custom-built case management software (NPDB Tracker) to improve workflow processes, document management, and communications. Two separate, independent analyses recommended that the NPDB implement Commercial Off the Shelf (COTS), "low-code" case management software to replace the NPDB Tracker functionality in order to improve flexibility and decrease the life-cycle cost for the solution." This again is an indictment of the GDIT engineered NPDB Tracker, on the authority of two independent analyses, pointing to major faults. GDIT's performance rating could not be "Exceptional Confidence" in light of these defects. The Brief Explanation stated, "The Government determined that Harmonia's three past performance references [US Department of Agriculture [USDA] Farm Services Agency (FSA), Department of Homeland Security (DHS) Immigration and Customs Enforcement

(ICE), and Census Decennial Information Technology Division (DITD)] were

Relevant, Relevant and Somewhat Relevant."

72.     That evaluation stands in contradiction to dozens of citations of Harmonia's three

past performance references that addressed all key requirements.  The ratings should all have

been Very Relevant.



75.

██████████████████████████████████

██████████████████████

76.     The Agency knew GDIT had underperformed, but it assigned the company an unwarranted high rating.  Simultaneously, the Agency

77.     Finally, the Brief Explanation does not demonstrate that the Agency evaluated <u>Factor 4 Section 508</u> at all.

78.     The Agency's errors prejudiced Harmonia.  If the Agency had appropriately evaluated quotes, it would not have assigned most (or all) of the weaknesses and would have assigned Harmonia additional strengths while decrementing GDIT's quote for an approach that failed.  Harmonia would have therefore received substantially higher ratings.  Under past performance, GDIT would have received low ratings while Harmonia would have received higher ratings.  And the Agency would have had to balance GDIT's █ percent higher price against Harmonia's better ratings.  It therefore would have had a substantial chance of receiving award.

**Count Two**
**The Agency's best value decision was unreasonable**

79.     Harmonia adopts the allegations in the preceding paragraphs by reference, as if fully set forth herein.

80.     As shown above, the Agency's evaluation was flawed.  The selection authority received bad inputs and made a flawed decision as a result.

81.     This error prejudiced Harmonia.  Had the selection authority evaluated appropriate strengths and weaknesses, he / she would not have concurred with the ratings and would have had to balance GDIT's ██ percent higher price against Harmonia's better ratings. Harmonia therefore would have had a substantial chance of receiving award.

## Prayer for Relief

WHEREFORE, Harmonia requests that this Court:

A.     Declare that the Agency's evaluation and award decision were arbitrary and irrational;

B.     Permanently enjoin the Agency from proceeding with performance based on the current evaluation and award decision; [1]

C.     Require the Agency to perform a proper evaluation and make a reasonable award decision; and

D.     Award Harmonia such other and further relief as the Court may deem just and proper, including, without limitation, bid and proposal costs.

Dated: June 26, 2024                          Respectfully submitted,

                                              /s/ Jon D. Levin
                                              Jon D. Levin

                                              *Attorney for Plaintiff, Harmonia Holdings Group, LLC*

---
[1] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

**OF COUNSEL:**

MAYNARD NEXSEN PC
655 Gallatin Street SW
Huntsville, Alabama 35801
(256) 512-5747
jlevin@maynardnexsen.com

### Certificate of Service

I hereby certify that on June 26, 2024, I caused copies of the foregoing to be served by electronic mail upon the following:

> U.S. Department of Justice
> Commercial Litigation Branch
> National Courts Section
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C., 20044

/s/ Jon D. Levin
Of Counsel